[Nos. 25095-4-III; 25129-2-III. Division Three. June 28, 2007.]

SPOKANE RESEARCH & DEFENSE FUND, *Plaintiff*, v. SPOKANE COUNTY ET AL., *Appellants*, SPOKANE PARKING PUBLIC DEVELOPMENT AUTHORITY ET AL., *Defendants*, THE CITY OF SPOKANE, *Respondent*.

SPOKANE RESEARCH & DEFENSE FUND, *Appellant*, v. SPOKANE COUNTY ET AL., *Defendants*, THE CITY OF SPOKANE, *Respondent*.

452

*Steven J. Tucker, Prosecuting Attorney*, and *Ronald P. Arkills, Deputy*, for appellants Spokane County, Spokane County Assessor, and Spokane County Treasurer.

*Stephen K. Eugster* (of *Eugster Law Office, PSC*), for appellant Spokane Research & Defense Fund.

*Laurel H. Siddoway*; and *James S. Craven, City Attorney*, and *Rocco N. Treppiedi, Assistant*, for respondent.

¶1 FRIEL, J.[*] — This opinion addresses consolidated appeals. The first appeal arises under Washington Constitution article VII, section 1, which provides that public property is exempt from taxation. The issue is whether the superior court correctly determined that the city of Spokane (City) had a specific interest in a downtown parking garage so as to qualify the garage for tax exemption.

¶2 The second appeal concerns a request for attorney fees by the attorney who filed and participated in the case giving rise to the first appeal. These legal services were claimed by the City to have been unnecessary because the City would have accomplished independently what the lawsuit did. The trial court denied the request for fees.

---

[*] Judge Wallis W. Friel is serving as a judge pro tempore of the Court of Appeals pursuant to RCW 2.06.150.

¶3  We affirm the superior court in both appeals.

## FACTS

¶4  The City's interest in the garage grew out of a complex series of agreements which provided a private developer with funds to finance the development of a downtown shopping mall. The Spokane Downtown Foundation (Downtown Foundation), a private nonprofit corporation, purchased the River Park Square Parking Garage (Garage) from the owner/developer of River Park Square, using proceeds from bonds issued on behalf of the City. The bonds were marketed and sold as being exempt from income tax within the meaning of IRS (Internal Revenue Service) Revenue Ruling 63-20.[1] The latter provides that a nonprofit corporation may issue federal income tax exempt bonds to finance the acquisition of a facility if ownership of the facility financed by those bonds ultimately vests in a public entity. The agreements underlying the Downtown Foundation's purchase of the Garage provided that the City would gain title to it at no extra cost after the bonds were paid from Garage revenue.

¶5  In the meantime, possession, management, and control of the Garage was in a public development authority (Public Parking Authority) created for that purpose. The City agreed to loan money to the Public Parking Authority from its parking meter fund if revenue from the Garage was insufficient to cover operating costs and ground lease payments. The real estate underlying the Garage would remain the property of the developers, who would lease the land to the Downtown Foundation, which, in turn, would assign the lease to the Public Parking Authority.

---

[1] "Revenue Ruling 63-20 provides that obligations issued by a nonprofit corporation . . . for the purpose of stimulating industrial development within a political subdivision of the state will be considered issued 'on behalf of' the political subdivision, for purposes of § 1.103-1 of the Income Tax Regulations, provided each of the following requirements is met . . . ." Clerk's Papers at 975-76. The ruling lists several requirements, including that the corporation engages in activities that are essentially public in nature and that the corporate income must not inure to any private person.

¶6 On January 27, 1997, the Spokane City Council passed an ordinance that outlined the lease agreements, created the parking meter fund, and delegated authority to the city attorney, city manager, and bond counsel to carry out the transactions contemplated. A citizens' group, CLEAN, challenged the ordinance. The Washington Supreme Court held the financing plan, and the ordinance under which it was approved, satisfied statutory and constitutional requirements. *CLEAN v. City of Spokane*, 133 Wn.2d 455, 462-63, 947 P.2d 1169 (1997).

¶7 Garage revenues were insufficient to cover the lease payments and operating expenses. The Public Parking Authority therefore requested a loan from the parking meter fund. The Spokane City Council refused to approve the loan. *River Park Square, LLC v. Miggins*, 143 Wn.2d 68, 72, 17 P.3d 1178 (2001). The developer then applied for a writ of mandamus to compel the city manager and city attorney to issue the loan. The superior court granted the writ, but the Supreme Court reversed. The court held that a Spokane City Council order approving the loan was first required. *Id.* at 80.

¶8 The superior court, in a later action, issued an alternative writ of mandamus directing the City to loan the Public Parking Authority revenue from its parking meter fund, which was upheld on appeal. *Eugster v. City of Spokane*, 118 Wn. App. 383, 76 P.3d 741 (2003). In concurrent federal litigation, representatives of the bondholders alleged securities fraud by the City and other parties to the bond issue. The federal court for the eastern district of Washington held, on summary judgment, that the developer did not control the Downtown Foundation and that the Downtown Foundation was an instrumentality of the City for purposes of state securities law.

¶9 Eventually, the City offered the Public Parking Authority the loans from its parking meter fund. But, in a settlement in the federal bond litigation, the maturity date of the bonds was accelerated, the City issued new bonds to pay off the old bonds, and the City acquired title to the

Garage in January 2005, which it then conveyed to one of the developer's corporations.

¶10 On June 9, 2003, Spokane Research and Defense Fund (Defense Fund), a Washington nonprofit corporation represented by Stephen Eugster, filed a complaint for declaratory judgment. Several entities were named as defendants, including Spokane County (County), the City, the Public Parking Authority, and the Downtown Foundation. Defense Fund alleged that the Public Parking Authority, under the agreement that set up the Downtown Foundation as purchaser of the Garage, was obligated to pay property taxes on the Garage. The complaint alleged that the County had assessed property taxes on the Garage, that taxes had not been paid, and that the County was about to commence foreclosure proceedings on the Garage property. Defense Fund alleged the City was the owner of the Garage and asked the court to declare the Garage tax exempt as a publicly-owned property under the laws of the state of Washington. *See* CONST. art. VII, § 1; RCW 84.36.010; RCW 35.21.755. It also asked for reasonable attorney fees.

¶11 The City answered and filed a counterclaim and cross-claims against the other parties. The City also sought a judicial determination that the Garage was tax exempt because it held the beneficial interest in the Garage, notwithstanding that the fee title was in the Downtown Foundation. The County answered and moved for summary judgment. The City also moved for summary judgment. The superior court granted the City's motion and denied the County's motion. The County appeals.

## STANDARD OF REVIEW

¶12 In reviewing orders on summary judgment, this court undertakes the same inquiry as the trial court, considering all facts and reasonable inferences in the light most favorable to the nonmoving party. *Kahn v. Salerno*, 90 Wn. App. 110, 117, 951 P.2d 321 (1998). Summary judgment is granted only where there is no genuine issue of material fact, and the moving party is entitled to judgment as a

matter of law. *Wilson v. Steinbach*, 98 Wn.2d 434, 437, 656 P.2d 1030 (1982).

## ANALYSIS

¶13 The issue presented in the summary judgment motions here is whether the Garage was exempt from property tax during the tax years 2000 to 2004, when fee title to the Garage was held by the Downtown Foundation.

¶14 Property is exempt under article VII, section 1 if the incidents of ownership and the beneficial ownership reside in a public entity or entities. *See Wash. Iron Works Co. v. County of King,* 20 Wash. 150, 151, 54 P. 1004 (1898); *Courtright Cattle Co. v. Dolsen Co.,* 94 Wn.2d 645, 655, 619 P.2d 344 (1980); *City of Kennewick v. Benton County,* 131 Wn.2d 768, 771, 935 P.2d 606 (1997). We, therefore, look to the documents and agreements underlying the renovation and expansion of the River Park Square Shopping Mall and Garage to determine whether the City had such an interest.

¶15 In support of its argument that the Garage was not tax exempt, the County cites the following evidence entered in the various litigations concerning the Garage: The City's bond attorney described the Garage financing in a 1996 newspaper interview as involving "no city credit, no city ownership, no city operation, no city pledge to the bonds." Clerk's Papers (CP) at 873. The developer's attorney, in a letter to a City employee, asserted that "the [G]arage is being built by a private party and will be sold to a non-profit private foundation." CP at 879. And, the Garage would not become a City asset until the bonds were paid. In the federal litigation, the Public Parking Authority's attorney asserted that the City never intended to, and never will, obtain title to the Garage because default is assured if revenues are insufficient to pay debt service and the City refuses to loan the Public Parking Authority money out of its parking meter fund.

Tax Exempt Status—No. 25095-4-III

¶16  We initially dispose of two evidentiary issues.

¶17  In the first of these issues, the County contends the superior court erred when it considered a letter written by a senior assistant attorney general in another case. The letter in question is dated October 22, 1998, and is from Senior Assistant Attorney General Leland T. Johnson in reply to the June 1997 letter of Hugh Spitzer, an attorney with Foster, Pepper & Shefelman of Seattle, Washington.[2] Mr. Johnson describes the Spitzer letter as having "set forth several situations exemplifying what you characterized as financing arrangements to be employed by the local governments for the acquisition of . . . facilities [for the benefit of a local government]." CP at 1222. With respect to property taxes, the letter concludes the property would be tax exempt, as follows:

> Your Letter describes transactions where the cost of constructing government facilities utilizes . . . financing, the securities for which are tax exempt pursuant to the provisions of IRS Revenue Ruling 63-20 and Revenue Procedure 82-26. . . . During the financing period, the title to the property in question will be held by a non-profit corporation or trustee.
>
> Proceeding upon the facts submitted in your Letter, the Department of Revenue has concluded that property held for the benefit of a Municipality would be regarded as exempt property within the meaning of RCW 84.36.010 while indebtedness representing financing of the facility is outstanding and prior to the transfer of title to the Municipality. The Department's conclusion is based on the employment of an absolute net lease as described in your Letter, which would thus be regarded as a financing lease consistent with the principles for identifying such leases in analogous situations as enunciated

---

[2] The record states that at the time Mr. Spitzer asked for the attorney general's opinion, he had no connection with the River Park Square development. He later served as the underwriter for the Garage financing.

by our courts. *See, e.g., Courtright Cattle Co. v. Dolsen Co.*, 94 Wn.2d 645, 619 P.2d 344 (1980).

CP at 1222-23.

¶18 CR 56(a) provides that "[a] party . . . may . . . move with or without supporting affidavits for a summary judgment in his favor." Under CR 56(e),

> [s]upporting . . . affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith.

¶19 The City cannot legitimately argue that the Johnson letter is "evidence." The City attached the letter to a memorandum it filed in the superior court. The City made no attempt to provide a supporting affidavit on which to base its admission.

¶20 At most, the Johnson letter is legal authority on which the City based its argument. But unlike formal attorney general opinions given to State agencies, informal letter opinions are accorded little, if any, weight. *See* WAC 44-06-030; *Thurston County v. City of Olympia*, 151 Wn.2d 171, 177, 86 P.3d 151 (2004) (citing *Kasper v. City of Edmonds*, 69 Wn.2d 799, 805, 420 P.2d 346 (1966)). And, in light of the fact we do not know the exact question Assistant Attorney General Johnson was responding to, this particular letter would be of no weight.

¶21 Nevertheless, we see no prejudicial error because, as set forth later in this opinion, other legal authority supports the superior court's determination that the property here was tax exempt. Nor does the letter create an issue of fact. It concerns a separate set of facts. In these circumstances, there is no more reason to reverse than there would be if the superior court had cited an unpublished appellate court opinion in its order. Our focus is whether the court correctly ruled on the substantive issue. The fact the record contained extraneous material or legal authority of very little, if any, weight is irrelevant.

¶22 The second evidentiary issue concerns the superior court's striking of a June 22, 2004 proposed adverse determination by the Tax Exempt Bond Group of the IRS, regarding the bonds' tax exempt status.

¶23 In its order on summary judgment, the superior court granted the City's motion to strike exhibit L from the declaration of Ron Arkills, deputy prosecuting attorney for the County. Exhibit L is a letter dated June 22, 2004, to the Downtown Foundation from the Department of Treasury, Internal Revenue Service, Tax Exempt Bond Group. It notified the Foundation that the Tax Exempt Bond Group had made a proposed determination that the interest income earned by the bond holders was not excludable for income tax purposes. The letter has a copy "received" stamp bearing the name of a law firm that represented the City. CP at 966. It advised the Foundation to either (a) immediately contact Derek Knight "to begin negotiations to resolve problems with the Bond Issue" or (b) request an administrative appeal. CP at 966. Attached to the letter is a copy of the proposed adverse determination. The letter is signed "Derek Knight, Manager TEB [Tax Exempt Bond] Group 7222." CP at 967.

¶24 As background, the "proposed adverse determination" concerned the bonds' fulfillment of IRS requirements for tax free interest income, which parallel some of the same factors outlined by Washington case law for the property tax exemption; i.e., incidents of ownership and beneficial ownership. Revenue Ruling 63-20 provides, in pertinent part:

> [O]bligations . . . will be considered issued "on behalf of" the political subdivision [if]
> - (1) the corporation must engage in activities which are essentially public in nature;
> - . . . .
> - (3) the corporate income must not inure to any private person;
> - (4) the state or a political subdivision thereof must have a beneficial interest in the corporation while the indebtedness remains outstanding and it must obtain full legal title to the property of the corpora-

tion with respect to which the indebtedness was incurred upon retirement of such indebtedness.

CP at 975-76.

¶25 The proposed determination concludes, on stated facts, that the bonds here were for private use and payment. The following are included in the determination:

Once it was determined that the Garage could be renovated and sold to the City as part of a funding mechanism for the rest of the project, a chain [of] events was put in place that appears to be designed to hide the true nature of the transaction. This is despite testimony that the transactions [sic] goal was always to buy the [G]arage and provide excess monies to the developer to be used for the total development. This is currently acknowledged as being understood by the City from the start.

. . . .

[The appraisal of the Garage commissioned by the City] was not a "fair market" (reasonable man willing buyer willing seller theory) valuation study, but was rather a concocted valuation based on unreasonable assumptions provided by the Developer.

. . . .

It appears that the City . . . participated in this structured transaction to aid in the development of the downtown area. The form of the structure is extremely flawed, as the substance show[s] inurement/private benefit for the Developer.

CP at 969-73 (footnotes omitted).

¶26 The proposed determination is hearsay unless it comes within an exception.[3] Under ER 803(a), "[t]he following are not excluded by the hearsay rule, even though the declarant is available as a witness: . . . (8) *Public Records and Reports*. [Reserved. See RCW 5.44.040.]" (Second alteration in original.) RCW 5.44.040 provides, as follows:

Copies of all records and documents on record or on file in the offices of the various departments of the United States and of this state or any other state or territory of the United States,

---

[3] Neither party relies upon the fact that the record does not contain a certified copy of the proposed determination. That fact alone would appear to make the proposed determination inadmissible. But the City states that it does not rely on the County's failure to authenticate the proposed determination because there is no bona fide dispute as to the authenticity of the document.

when duly certified by the respective officers having by law the custody thereof, under their respective seals where such officers have official seals, shall be admitted in evidence in the courts of this state.

¶27 Here, the proposed determination is not an IRS final decision. If appealed, it is reviewed de novo by the Office of Appeals, a division of the IRS that is independent of the office that issued the proposed determination. The City asserts that "[t]he Foundation appealed the Proposed Determination and at the time of the summary judgment hearing, no final IRS decision had issued." City's Br. at 47. Therefore, the City argues that the proposed determination should not be considered. It cites language from *Brown v. Sierra Nevada Memorial Miners Hospital*, 849 F.2d 1186, 1189-90 (9th Cir. 1988), to the effect that only those factual findings that an agency approves and adopts are admissible under the public records exception to the hearsay rule. *See also City of New York v. Pullman, Inc.*, 662 F.2d 910, 914 (2d Cir. 1981).

¶28 The record on summary judgment includes a declaration by the City's lawyer that it was her understanding that the Downtown Foundation appealed the proposed determination. The County did not deny that assertion in its reply brief. As the party offering the proposed determination for admission, it had the burden to produce evidence to establish that it was a public record of sufficient reliability for admission under ER 803.

¶29 Therefore, this court agrees that the proposed determination must be excluded.

¶30 We now consider the grant of summary judgment—has the City established that no dispute of material fact exists and the Garage is exempt as a matter of law from County real property taxes in the years 2000 to 2004? *See* CONST. art. VII, § 1; RCW 84.36.010; RCW 35.21.755.

¶31 The Washington Constitution provides in article VII, section 1, as follows:

The word "property" as used herein shall mean and include everything, whether tangible or intangible, subject to owner-

ship. . . . Property of the United States and of the state, counties, school districts and other municipal corporations . . . shall be exempt from taxation.

Under RCW 84.36.010(1), "[a]ll property belonging exclusively to the United States, the state, or any county or municipal corporation . . . is exempt from taxation." And under RCW 35.21.755(1), "[a] public corporation, commission, or authority created pursuant to RCW 35.21.730, 35.21.660, or 81.112.320 shall receive the same immunity or exemption from taxation as that of the city, town, or county creating the same."

¶32 The material facts are not in dispute. The case turns on whether the agreements here support a holding that a public entity owned the Garage, even though title was held by the Downtown Foundation until such time as the bonds were paid off.

¶33 The City argues that the incidents of ownership in the Garage lie with it or with the Public Parking Authority and, therefore, the Garage property is tax exempt. *See* RCW 35.21.755 (Public Development Authority receives same immunity as city creating it); *Clallam County v. United States*, 263 U.S. 341, 345, 44 S. Ct. 121, 68 L. Ed. 328 (1923) ("The incorporation and formal erection of a new personality was only for the convenience of the United States to carry out its ends.").

■■ ¶34 Case law has identified certain incidents of ownership as supporting a finding of ownership for tax exemption purposes.

¶35 As early as 1898, the Washington Supreme Court held that a person who purchases real property from the state of Washington was the owner for purposes of deciding whether the property was tax exempt, even though the contract for purchase was not yet fully paid and the contract provided the State could forfeit if the purchaser failed to make payment on the contract. *Iron Works,* 20 Wash. at 153. The court observed that such lands "are in the *possession, use, occupation* and enjoyment of private own-

ers. They are no longer a part of the public domain of the state. [The purchasers] are the owners, possessing a real and substantial interest, *which they can assign, transfer and dispose of* as they choose." *Id.* (emphasis added); *see also Wasser & Winters Co. v. Jefferson County*, 84 Wn.2d 597, 599, 528 P.2d 471 (1974) (*perfect and unencumbered title to property not required* for ownership; rather, the person must be vested with the apparent legal title or with the possession coupled with such claims and evidence of ownership as will justify the assumption that he is the owner).

¶36 In *Courtright Cattle*, the court examined the difference between a lease and a financing arrangement that is associated with an ownership interest. *Courtright Cattle*, 94 Wn.2d at 655. Provisions important in determining whether a financing arrangement exists include (1) whether the lessee has an *option to purchase* and whether the option price is nominal, (2) whether the lessee acquires any *equity*, (3) whether the lessee bears the entire *risk of loss* or pays all *taxes* on ownership, (4) whether there is a provision for acceleration of rent payments, and (5) whether the property was *purchased specifically for lease to this lessee. Id.* at 656.

¶37 More recently, the Supreme Court addressed a related question in the context of Benton County's levy of property taxes on the city of Kennewick's 49 percent interest in the Tri-Cities Coliseum. *Kennewick*, 131 Wn.2d 768. The coliseum was jointly owned by the city and a private corporation. The city *contributed 49 percent of the purchase price and shared in profits and liabilities in that same percentage.* However, legal title to the coliseum was in the city's name, held in trust for the joint venturers. *Id.* at 770. The court held that only the 49 percent interest actually held by the city was tax exempt, even though fee simple title was held in the city's name. The material determination was who benefited from the ownership structure and whether the property was used for a public purpose. *Id.* at 772-73. As to the latter factor, the court cited RCW

67.28.120, which authorizes municipalities to individually or jointly purchase public stadium facilities. *Id.* at 773.

¶38 Here, the City and the Public Parking Authority had possession, use, and occupation of the Garage. The Public Parking Authority had to insure the Garage and pay taxes on it. And, the Garage was purchased specifically for lease to the Public Parking Authority. The Garage served a public purpose—it provided off-street parking for persons visiting nearby public buildings and a park. And, the City benefited from the ownership structure in that it ultimately vested title in the City at no cost. The incidents of ownership and the beneficial ownership resided in the Public Parking Authority and the City.

¶39 The County argues that the City had no right to possession of the Garage; however, this argument ignores the fact that, under RCW 35.21.755, the Public Parking Authority has the same exemption as the City. And, the agreements underlying this project provided that the Public Parking Authority had possession of the Garage, the responsibility to operate the Garage, and the responsibility for maintenance, risk of loss, and payment of taxes.

¶40 Nevertheless, the County argues that the Public Parking Authority had possession of the Garage only under a lease, not under an ownership interest. The Downtown Foundation had the right to reenter upon default; the Public Parking Authority acquired no equity and had no option to purchase; and the Public Parking Authority's accounting records did not reflect accounting entries that would support viewing the lease as a financing arrangement. The County discounts the Public Parking Authority's assumption of such ownership burdens as payment of insurance, as not uncommon in lease arrangements. According to the County, those provisions only serve the purpose of assuring that the landlord's receipts are all profits. But again, the County's arguments are based, in part, on ignoring the fact the agreements provided for the Public Parking Authority's role as a means to an end—eventual ownership of the Garage by the City.

¶41 The County cites cases from other jurisdictions in support of its argument that the arrangement here was a true lease, not a financing vehicle. But an examination of those cases reveals nothing that would lead to such a conclusion. For example, *Mayhew Technical Center v. County of Sacramento*, 4 Cal. App. 4th 497, 505, 5 Cal. Rptr. 2d 702 (1992) held that the state of California had the essential indicia of ownership under an agreement to lease an office for a state board, so as to render the property exempt from county taxes. There, the state held the exclusive right to occupy and use the property, and title vested in it, if all rental payments were made.

¶42 Next, the County argues that the Public Parking Authority was not the alter ego of the City. And, therefore, the fact the *City* was to receive title when the bonds were satisfied does not weigh in favor of treating the *Public Parking Authority's lease* as a financing arrangement. The County cites the fact the City refused to provide budgetary or staff support to the Public Parking Authority or make loans to the Public Parking Authority when Garage revenues were insufficient to cover costs. The County argues the facts here are in contrast to the facts in cases in which it was determined the public corporation was the governmental entity's alter ego. *See King County v. U.S. Shipping Bd. Emergency Fleet Corp.*, 282 F. 950 (9th Cir. 1922); *Pac. Grove-Asilomar Operating Corp. v. County of Monterey*, 43 Cal. App. 3d 675, 117 Cal. Rptr. 874 (1974).

¶43 The facts cited by the County are insufficient to defeat the obvious intent of the original parties to these agreements that the Public Parking Authority was created to assume the day-to-day operations of the Garage, with the end result of the City acquiring title to the Garage. As in *Emergency Fleet*, the property "was acquired with public funds" and the operating authority was "brought into existence" by the governmental entity. *Emergency Fleet*, 282 F. at 953. It "would . . . sacrifice substance to form"[4] to

---

[4] *Emergency Fleet*, 282 F. at 953.

hold that neither the City nor the Public Parking Authority had an ownership interest that qualified for the public entity exemption simply because those interests were bifurcated—i.e., because the City had the beneficial interest of eventually receiving title to the Garage and the Public Parking Authority had possession and other incidents of ownership.

¶44 Finally, the County argues that the City had no "indefeasible and automatic right to acquire title to the Garage upon the payment of the bonds for no additional consideration." County's Br. at 26. The County bases this argument on statements made by the City's attorney in the course of other litigation to the effect the City likely would never acquire title because the bonds were in default and the City refused to loan parking meter money to the Public Parking Authority. But *Iron Works* specifically holds that the *possibility* of default is not sufficient to defeat an ownership interest. *Iron Works*, 20 Wash. at 155. In fact, the prior litigation was ultimately settled and the City did take title, which it then transferred to one of the developer's corporations under the settlement agreement.

¶45 There is no dispute of material fact. And, the Garage is entitled to a tax exemption as a matter of law. The superior court properly granted the City's motion for summary judgment.

¶46 Affirmed.

Attorney Fees—No. 25129-2-III

¶47 The issue in the consolidated appeal is whether the superior court erred when it denied attorney fees to Defense Fund under either a common fund theory, a protection of constitutional principle theory, or quantum meruit.

¶48 On February 13, 2006, Defense Fund filed a motion for attorney fees under the common fund doctrine. The City countered with the declaration of Laurel Siddoway—who represented the City—in which she attested that, before Defense Fund brought this action, the parties discussed

legal procedures to avoid the tax foreclosure, and that Defense Fund "pre-empted the issue by initiating this action." CP at 1620. In support of Defense Fund's argument that it played a pivotal role in the litigation, Defense Fund submitted Stephen Eugster's declaration. The declaration includes exhibit B, which reflects that Mr. Eugster contacted counsel for the other parties on June 27, 2005, after receiving a notice from the court that the case would be dismissed for inaction. He admits, however, that he did not have to take the lead in going forward with the action.

¶49 On March 27, 2006, the superior court denied the motion. The court's order states, in part, as follows:

1. The common fund doctrine does not apply. This is not a class action, and there is no fund created or preserved by this action for the "common" benefit.

2. Quantum meruit does not apply to this case. No one was unjustly enriched by plaintiff's conduct in filing this lawsuit.

CP at 1608.

¶50 In addition to the arguments it submitted at trial, Defense Fund contends that attorney fees should be allowed in equity when a litigant has protected constitutional principles. *Mansour v. King County*, 131 Wn. App. 255, 273, 128 P.3d 1241 (2006). The constitutional principle protected here is that taxes cannot be imposed on a governmental entity.

A. Common Fund

¶51 "Attorney fees are not awarded unless expressly authorized by contract, statute, or recognized equitable exception. Under the common fund doctrine, a narrow equitable exception, attorney fees will be awarded only when a party creates or preserves a common fund for the benefit of others in addition to themselves." *Pierce County v. State*, 159 Wn.2d 16, 50, 148 P.3d 1002 (2006) (citations omitted).

¶52 Here, the superior court found there was no fund created for the common benefit. The superior court's denial

of fees is sustainable, even if this court were to agree with Mr. Eugster that he and other City residents benefited from the finding of tax exemption. The declaration of Laurel Siddoway supports a finding that the City would have opposed foreclosure on tax exemption grounds had Defense Fund not "beaten it to the punch." Therefore, Defense Fund did not create the fund. The result would have been the same had it not acted at all.

B. Quantum Meruit

¶53 "Quantum meruit is a Latin phrase meaning 'as much as he deserves.' The concept refers to the extent of liability on a contract implied by law, and is premised on the desirability of avoiding unjust enrichment. Thus, the law will imply a promise to pay a reasonable amount for labor and materials in the absence of an express promise to do so." *Barr v. Day*, 124 Wn.2d 318, 330 n.3, 879 P.2d 912 (1994).

¶54 There is no reason to imply a promise to pay here. As the City points out, Defense Fund acted as a volunteer when it filed this action. The City would have filed the action had Defense Fund not filed it.

C. Upholding a Constitutional Principle

¶55 This argument was not raised in the trial court. But it fails for the same reasons stated above.

¶56 The court did not err when it refused to award attorney fees to Defense Fund.

¶57 Affirmed.

BROWN, J., and MILLER, J. PRO TEM., concur.

Reconsideration granted and opinion modified October 23, 2007.